***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms with modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers' Compensation Act.
4. An employment relationship existed between employee and employer on April 16, 1998.
5. Plaintiff suffered an admittedly compensable injury by accident arising out of and in the course and scope of employment on April 16, 1998.
6. Plaintiff's average weekly wage at the time of the accident was $450.75 or $450.73.
7. Plaintiff's workers' compensation rate of pay is $300.50 or $300.49.
8. Plaintiff has been paid all temporary total disability benefits from the date of the accident to the present for all times he has been out of work, and continues to receive temporary total disability.
The issues presented to the Full Commission are: (a) whether Plaintiff is entitled to continuing temporary total disability compensation; (b) whether Defendants may terminate Plaintiff's benefits as of any certain date; and (c) whether Defendants are entitled to any relief for overpayments.
 ***********
Based upon the foregoing Stipulations and the evidence presented, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, Plaintiff was 38 years old and had a high school diploma. From 1983 to 1993, Plaintiff worked at Cecil's Mobile Home Service as a laborer. From 1993 to 1997, Plaintiff worked at Lorris Medical as the warehouse shipping and receiving supervisor. In October 1997, Plaintiff began working for Defendant-Employer as a home health technician. His duties included delivering and installing medical equipment such as motorized hospital beds, liquid oxygen tanks, gas oxygen tanks and wheelchairs. Plaintiff also showed clients how to use the equipment. The deliveries originated from Defendant-Employer's warehouse. Plaintiff delivered to homes and hospitals between Raleigh and Greenville, including Roanoke Rapids and Franklin County.
2. As a home health technician, Plaintiff earned $9.50 per hour. His work hours were 8:00 a.m. to 5:00 p.m., but he generally worked at least 20 hours overtime per week, in which he would earn time and a half. At the beginning of his employment, Plaintiff had to drive his own vehicle for the deliveries. At some time thereafter, Plaintiff was able to drive the company van for deliveries.
3. As a part of his duties, Plaintiff also loaded the equipment, which was frequently heavy, into the van and removed the equipment from the van. He took the equipment inside of clients' homes, no matter for what floor the equipment was destined. In an average week, Plaintiff delivered 25 hospital beds, most of which were motorized, and 10 to 15 wheelchairs. Plaintiff also delivered oxygen tanks ranging in weight from 7 or 8 pounds to 150 pounds each. The hospital beds weighed 150 pounds and were generally unpacked and disassembled.
4. On 16 April 1998, Plaintiff injured his lower back when he was lifting and moving a full liquid oxygen tank in his van. This tank weighed 150 pounds. Plaintiff testified that the pain in his lower back felt like a lightning bolt radiating from his lower back to his toes on the right side. Plaintiff got out of the van and held onto a pole to keep pressure off of his right leg. The owner of Defendant-Employer saw Plaintiff and asked what had happened. Plaintiff reported his injury to the owner, who immediately got a manager to take Plaintiff to Urgent Care. Plaintiff received a prescription and was sent home.
5. Plaintiff testified that prior to his 16 April 1998 injury, he had never missed work while employed with Defendant-Employer due to back problems. Plaintiff had pre-existing back problems for which he underwent surgery on 1 January 1996, made a complete recovery and returned to work with Lorris Medical without restrictions.
6. As to his 16 April 1998 injury, Plaintiff saw Dr. Macedo, who had performed his previous surgery, on 23 April 1998. Dr. Macedo treated Plaintiff conservatively with medications and on 30 April 1998, Plaintiff reported that his symptoms had improved almost 95%. Plaintiff did not return to Dr. Macedo for treatment. Dr. Macedo wrote Plaintiff out of work from 23 April 1998 to 30 April 1998.
7. On 12 May 1998, Plaintiff was seen by Dr. Adolfo Marsigli. He reported injuring himself at work and described pain in his right leg. An x-ray revealed bone loss at L4-5 on the left side, narrowing of the space at L4-5 and facet arthritis. Plaintiff was treated with heat, massage and pain medication. Plaintiff was written out of work until 18 May 1998, when he was to return to work in a light-duty capacity.
8. On 8 June 1998, Plaintiff saw Dr. Eduardo O. Marsigli, brother of Dr. Adolfo Marsigli. Dr. E. Marsigli ordered an MRI, which revealed a mild left paracentral bulging without herniation at L4-5, L5-S1 and right paracentral bulging at L2-3. Dr. E. Marsigli's assessment was epidural fibrosis and degenerative discogenic disease. He recommended conservative treatment.
9. On 14 July 1998, Plaintiff was involved in a minor car accident where a woman struck his left leg, causing him to stumble. The police were not notified and an accident report was not prepared. Plaintiff testified that the car accident had no significant impact on his back.
10. Dr. E. Marsigli saw Plaintiff again on 15 July 1998 after the car accident. Dr. E. Marsigli opined that Plaintiff's car accident did not have much impact on Plaintiff's outcome, although it did not help Plaintiff's back condition. Dr. E, Marsigli recommended pain management and work hardening. Plaintiff continued with the work hardening program into November 1998.
11. Dr. E. Marsigli was of the opinion that Plaintiff did not have a normal back when he began working for Defendant-Employer and lifting very heavy materials. He opined that Plaintiff should have never worked as a lifter after his first back surgery. Dr. E. Marsigli was of the opinion that Plaintiff's lifting of a 150-pound liquid oxygen tank aggravated a pre-existing condition of Plaintiff's back.
12. Defendants referred Plaintiff to Dr. Scott S. Sanitate, who is board-certified in physical medicine, rehabilitation and electrodiagnostic medicine. Dr. Sanitate first saw Plaintiff on 21 January 1999. He reviewed Plaintiff's previous medical records and examined Plaintiff. When Dr. Sanitate reviewed the MRI and myelogram reports, he noted that they indicated that Plaintiff had epidural fibrosis or scarring around the surgical site from a previous disc surgery. He was of the opinion that epidural fibrosis or scarring can cause pain with heavy or improper lifting. Dr. Sanitate testified that Plaintiff complained of pain and his movements were consistent with someone in pain. Dr. Sanitate also noted that Plaintiff exhibited behavior during the examination that was inconsistent with someone with a herniated disc, nerve trauma or nerve inflammation. On 3 February 1999, Plaintiff reported some relief with the use of a TENS unit.
13. Because of inconsistencies in Plaintiff's physical examination, Dr. Sanitate did not believe that there was any true pathology perpetrating Plaintiff's symptoms. He assessed Plaintiff with a 0% permanent partial impairment rating. Dr. Sanitate was of the opinion that Plaintiff did not need surgery, but he recommended vocational rehabilitation and that Plaintiff should seek light duty work with no lifting greater than 25 pounds.
14. Plaintiff worked with Susan Speakman, a rehabilitation nurse, to look for a lighter-duty job. During 1999, Plaintiff periodically went to the Employment Security Commission in Raleigh and Roanoke Rapids. In November 2000, Plaintiff met with Alice Femar, who administered math and reading tests.
15. On 5 November 2001, Plaintiff met with Doris Glen, a rehabilitation nurse. She recommended pain management and referred Plaintiff to Dr. Cero. Dr. Cero prescribed methadone and Oxycontin for Plaintiff's pain. However, Plaintiff testified that these medications made him feel suicidal and depressed. He then went to see Dr. Scott Cunningham on Ms. Glen's recommendation.
16. Dr. Cunningham is board-certified in psychiatry. He performed a psychiatric examination on Plaintiff in November 2001. Plaintiff reported to Dr. Cunningham that he injured his back in April 1998 while moving an oxygen tank in a van. Plaintiff related that he had been prescribed narcotics and had gone through opiate narcotic withdrawal with suicidal ideations. Plaintiff also reported that he had trouble falling asleep and remaining asleep, decreased appetite, low energy, pain, loss of pleasure and feelings of helplessness, sadness, hopelessness, worthlessness and guilt. There was no evidence of psychosis. Dr. Cunningham's assessment was recurrent major depression, opiate dependence and chronic pain with moderate to severe stressors.
17. Plaintiff was admitted to Coastal Plain Hospital and Counseling Center on 16 November 2001 and stayed until 20 November 2001. Dr. Cunningham noted that Plaintiff's symptoms were greatly improved, as Plaintiff was able to sleep and eat and he had a better mood and no more suicidal thinking. Nonetheless, Plaintiff's pain level did not change.
18. Plaintiff was again admitted to Coastal Plain Hospital and Counseling Center on 21 February 2003 and stayed until 7 March 2003. His experience then was very similar to what it had been in November 2001. His diagnosis was major recurrent depression, moderate chronic pain and high blood pressure. Dr. Cunningham opined that Plaintiff was not malingering.
19. Plaintiff was admitted to Cherry Hospital on 17 March 2003 because Dr. Cunningham believed Plaintiff was a high-risk patient and that he had nothing else to offer to Plaintiff. At the time of Dr. Cunningham's deposition on 4 June 2003, Dr. Cunningham did not believe that Plaintiff was mentally fit to engage in any type of employment. Dr. Cunningham opined that Plaintiff's prognosis was "grim" and deferred the question of causation to Plaintiff's orthopedic physicians.
20. Dr. Cunningham opined that Plaintiff's emotional condition was not directly related to his 16 April 1998 injury. However, he was of the opinion that Plaintiff's emotional condition was "definitely" related to all the sequelae from the injury, including lessened income and chronic pain.
21. Doris Glen recommended that Plaintiff go to Dr. William Lestini. On 10 December 2001, Plaintiff first saw Dr. Lestini, who is board-certified in orthopedic surgery. Dr. Lestini was familiar with Plaintiff's MRI results and ordered a discogram, which revealed a normal L2-3 disc, a midline central tear at L3-4 and gross internal derangement, herniation and collapse at L4-5 and L5-S1.
22. Dr. Lestini recommended surgical intervention. Defendants approved a three-level fusion and surgery was scheduled for 15 May 2002. However, prior to surgery, Plaintiff experienced an anxiety attack and canceled the surgery. After being treated by Dr. Cunningham, Plaintiff called Doris Glen to reschedule the surgery. He was informed that Defendants had refused to pay for the surgery after Plaintiff canceled the first surgery date.
23. On 7 August 2002, Dr. Lestini performed the surgery, which consisted of a three-level fusion. Plaintiff filed the claim with his own health insurance company. Plaintiff participated in two sessions of physical therapy, which was also paid for through his own health insurance. Plaintiff testified that Defendants have refused to pay for any medical treatment after 7 August 2002.
24. Dr. Lestini opined that Plaintiff was doing well post-operatively, with only mild back discomfort. Dr. Lestini took Plaintiff out of work from 7 August 2002 until 13 May 2003 and testified that Plaintiff was temporarily totally disabled from 9 October 2001 until at least 3 June 2003, the date of Dr. Lestini's deposition. Dr. Lestini opined that Plaintiff had a 40% permanent partial impairment rating to his back. Dr. Lestini was of the opinion that Plaintiff could work in a light-duty job with no lifting over 20 pounds and gradual progression of work hours from four to eight per day over a six-week period. He was unable to be more specific without a functional capacity examination.
25. Dr. Lestini further opined that Plaintiff's disc problems, including the tear at L3-4, were caused by the lifting incident on 16 April 1998. His opinion was based on the mechanism of the injury, the acute onset of pain, the fact that Plaintiff had no prior existing pain and that Plaintiff had been working a long time after his prior surgery. Greater weight is given to the opinion of Dr. Lestini over any contradicting opinions.
26. Plaintiff testified that he is willing to participate in vocational rehabilitation.
27. On April 16, 1998, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with Defendants, for which certain workers' compensation benefits continue to be paid.
28. Based on the greater weight of the evidence, Plaintiff's medical treatment by Dr. Lestini, including surgery, his treatment for major depression and other psychological conditions, including in-patient psychiatric admissions, and his current disability are causally related to his admittedly compensable injury by accident of April 16, 1998.
29. Plaintiff's average weekly wage at the time of the accident was $450.75 or $450.73, yielding a compensation rate of $300.50 or $300.49.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On April 16, 1998, Plaintiff sustained an injury by accident arising out of and in the course of his employment with Defendants, for which certain workers' compensation benefits have been and continue to be paid. N.C. Gen. Stat. §§ 97-2(6); 97-29.
2. Plaintiff is entitled to have Defendants provide medical care for his back and his psychological conditions arising from his injury for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief and will tend to lessen Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
3. Plaintiff is entitled to have Defendants provide all medical treatment rendered by Dr. Lestini and any medical providers associated with the care that Dr. Lestini has provided such as any hospitals including Raleigh Community Hospital, any radiologists or anesthesiologists.
4. Plaintiff is entitled to have Defendants provide all medical treatment rendered by Dr. Cunningham and any medical providers associated with the care that Dr. Cunningham has provided such as mental health facilities including Coastal Plains Hospital, Cherry Hospital, and Roanoke Chowan Hospital.
5. Plaintiff is entitled to continuing temporary total disability compensation until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is obligated to participate in vocational rehabilitation provided by Defendants. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for all medical treatment rendered by Dr. Lestini and any medical providers associated with the care that Dr. Lestini has provided such as any hospitals including Raleigh Community Hospital, any radiologists or anesthesiologists.
2. Defendants shall pay for all medical treatment rendered by Dr. Cunningham and any medical providers associated with the care that Dr. Cunningham has provided, such as mental health facilities including, Coastal Plains Hospital, Cherry Hospital, and Roanoke Chowan Hospital.
3. Defendants shall continue to pay temporary total disability to Plaintiff in the amount of $300.50 per week until further Order of the Industrial Commission. From the compensation due Plaintiff, Defendants shall deduct every fourth check and pay such amount directly to Plaintiff's counsel.
4. Plaintiff's counsel is entitled to an attorney's fee of 25% of the compensation due Plaintiff.
5. Defendants shall pay the costs.
This the ___ day of February 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER